**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| CONGREGATION KOLLEL, INC., and ZEBRA HOLDINGS II, LLC,<br><br>       Plaintiffs,<br><br>v.<br><br>TOWNSHIP OF HOWELL, N.J., and HOWELL TOWNSHIP ZONING BOARD OF ADJUSTMENT,<br><br>       Defendants. | Civ. No. 3-16-CV-02457-FLW-LHG |

## FIRST AMENDED COMPLAINT

Plaintiffs Congregation Kollel, Inc. and Zebra Holdings II, LLC, by their undersigned attorneys, complain of Defendants, Township of Howell, New Jersey, and Howell Township Zoning Board of Adjustment as follows:

### NATURE OF ACTION

1. Plaintiffs file this action to redress violations of their civil rights caused by the Defendants' burdensome, discriminatory, and unreasonable land use regulations and intentional conduct that have prohibited and continue to prohibit Congregation Kollel, Inc. (the "Kollel") from building and operating a religious educational facility on its property in Howell Township, New Jersey in violation of the United States Constitution, the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. §§ 2000c et seq. ("RLUIPA'), the Fair Housing Act, and the New Jersey Law Against Discrimination.

2. Plaintiffs intend to develop their property in Howell Township as a religious educational facility in a zoning district that permits educational facilities by right.  However, the

Township of Howell (the "Township") and the Howell Township Zoning Board of Adjustment (the "Board") have imposed and implemented their land use regulations in such a manner as to prevent Plaintiffs from engaging in such religious exercise.

3.     The Defendants have prohibited Plaintiffs' land use based on its religious nature. Furthermore, such decisions were motivated by animus toward the ultra-Orthodox Jewish community, and were directly responsive to significant community hostility toward the ultra-Orthodox Jewish community, who have been described by the local community as "parasites," a "cult", a "hoard [sic] of locusts heading for Howell," "dumb assholes," "rude dirty ass people," and "[P]harisees."

4.     The Defendants' laws and actions have substantially burdened Plaintiffs' religious exercise without a compelling governmental interest, prohibited Plaintiffs' religious land use throughout the Township's jurisdiction, treated Plaintiffs' religious educational facility on less than equal terms as a nonreligious educational facility, and discriminated against the Plaintiffs based on their religious denomination.

## PARTIES

5.     Plaintiff Congregation Kollel, Inc. is a domestic nonprofit corporation organized under the laws of the State of New Jersey in 2005.

6.     Plaintiff Zebra Holdings II, LLC is a domestic nonprofit corporation organized under the laws of the State of New Jersey in 2005.

7.     Defendant Township of Howell is a municipal corporation located in Monmouth County, New Jersey, with an address of 4567 Route 9 North, P.O. Box 580, Howell, N.J. 07731.

8.      Defendant Township of Howell Zoning Board of Adjustment is a zoning board organized under N.J.S.A. 40:55D-69 and Section 188-139 of the Code of the Township of Howell. It has an address of 4567 Route 9 North, P.O. Box 580, Howell, New Jersey 07731-0580.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction) because this action is brought under RLUIPA, 42 U.S.C. §§ 2000cc *et seq.*, the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, and 42 U.S.C. § 1367(a).  This Court also has supplemental jurisdiction over Counts IX, X and XI under 28 U.S.C. § 1367(a) for claims brought under New Jersey law.

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because all of the events giving rise to the claims herein occurred in this District and the Defendants are subject to personal jurisdiction in this District as of the commencement of this action.

## FACTUAL ALLEGATIONS

### The Kollel

11.     The Kollel is an Orthodox Jewish religious organization based in Lakewood, New Jersey.

12.     The Kollel's religious mission includes the advancement of the Orthodox Jewish faith and Talmudic studies.

13.     In furtherance of its religious mission, the Kollel owns and operates a higher Talmudic academy for the training of rabbinical judges located at 625 Forest Avenue, Lakewood, New Jersey (the "Lakewood Academy").  The Lakewood Academy has been in existence since 2005.

14.     As part of its religious exercise, the Kollel requires additional educational facilities for Talmudic learning by younger students, some of whom will graduate to the Lakewood Academy.

15.     It is the Kollel's religious belief that it should provide religious education in the form of Talmudic study for Jewish scholars.

16.     The Talmud is a 26-volume work comprised of the central core of the Torah's oral tradition which was given to Moses at Mount Sinai along with the tablets containing the Decalogue.  The sages completed the Babylonian Talmud over 2000 years ago, after being exiled from Jerusalem following the destruction of the Temple.  The Talmud is a compilation of legal, historical and ethical case studies and didactic texts is written in a combination of ancient Aramaic and Hebrew.

17.     Studied over the centuries, Jews have built upon this foundation of traditional wisdom over the course of the Diaspora, and thousands of companion volumes have been authored to elucidate and elaborate upon these ancient texts.

18.     The study of Talmud is complex and demanding.  A Talmudic scholar, known as a *Talmid chacham,* is an expert in the entire Babylonian Talmud both the text and its commentaries. The goal of becoming a *Talmid chacham* is a lifelong endeavor, avidly pursued by serious students for decades.

19.     Serious Talmudic scholars who seek to master the basic Babylonian Talmud and its commentaries typically commit two or more decades of intensive analysis to studying its 63 Tractates.  Each Tractate consists of a unique set of laws, and often a unique syntax and style of analysis.

20. Rabbinical judges apply *halacha*, or Jewish Law, within Jewish religious courts, known as *beit din*. *Halacha* is found within the Talmud.

21. *Beit din* are necessary to apply Jewish laws and rule on such varied and important aspects of religious Jewish life as Kosher certification, certification of ritual Jewish baths, decisions related to who is a Jew and conversion to Judaism, business disputes between religious Jews, divorces, and questions related to religious burial and mourning.

22. In order to maintain effective and knowledgeable *beit din*, the religious Jewish community must have appropriate facilities to train Talmudic scholars who are knowledgeable in *halacha* and who may become Jewish judges.

23. In prior centuries, such institutions principally existed in Europe, but many of them were destroyed or closed during the *Shoah* (the Holocaust) in the 1930s and 1940s. As a result, there are far too few such institutions, especially ones of high caliber like the Lakewood Academy.

24. There are approximately fifty to sixty individuals enrolled in the Lakewood Academy at any given time with an average age of approximately forty. They are all male.

25. The Lakewood Academy is at capacity in its current location and cannot expand its programs in its current location.

26. Recognizing a need to train men as community leaders and to prepare them for the Lakewood Academy, in 2014 the Kollel decided to expand its programming to include a *mesivta* and a *yeshiva gedola*.

27. A *mesivta* is a religious educational facility that emphasizes Talmudic studies for students that are of post-bar mitzvah age.

28. A *yeshiva gedola* is a religious educational facility for Talmudic studies for undergraduate-level students.

29.     The Kollel's planned *yeshiva gedola* would prepare Talmudic scholars for further Talmudic study at the Lakewood Academy.

30.     The Kollel's planned *mesivta* would provide religious education for males aged approximately fourteen through eighteen.

31.     There would be 25 students in each year at the *mesivta,* for a total of 100 students.

32.     Approximately one-half of the *mesivta* students would be from outside of New Jersey, and would reside in dormitories on-site.

33.     The remaining *mesivta* students would be bussed to the facility.

34.     The Kollel's planned *yeshiva gedola* would provide religious education for males aged approximately eighteen to twenty-two.

35.     There would be 30 students in each year of the three-year program at the *yeshiva gedola* for a total of 90 students.

36.     All of the *yeshiva gedola* post-high school students, approximately 90 total, would live in dormitories on-site.

37.     After completing their course of studies, the Kollel's students would be able to matriculate to the Lakewood Academy or would pursue further studies in Israel before returning to the Lakewood Academy.

38.     The Kollel intends to provide students with the skills and the methodology at its planned religious educational facility for advanced Talmudic study at the Lakewood Academy.

39.     The planned program would also equip each student with a broad content base so that he has mastered a wide range of Talmudic laws and principles.

40.     The Plaintiffs believe that there are far too few institutions such as the proposed *mesivta* and *yeshiva gedola* to prepare scholars for advanced Talmudic study. The Kollel believes

that such institutions are necessary for the Jewish community and that it should provide such religious program.

41.     The *mesivta* and *yeshiva gedola* would not seek licensure by the State of New Jersey.

42.     The *yeshiva gedola* would seek accreditation by the Association of Advanced Rabbinical and Talmudic Schools, an accreditation agency recognized by the Council on Higher Education Accreditation.

43.     All of the Kollel's students at the *mesivta* and *yeshiva gedola* would be male.

44.     None of the students would be married.

45.     There would be approximately ten to thirteen full and part-time faculty members.

46.     The Kollel has proposed that eight faculty members would reside at the Kollel's educational facility.  Such faculty, who will generally be married, would reside with their spouses on-site in order to supervise students, be available to address issues that may arise, and to be present on the Sabbath with the students since they cannot drive to and from the property on the Sabbath.

47.     Up to five faculty members would reside outside of the Kollel's educational facility.

48.     The Kollel's educational facility would employ an additional three to four employees.

49.     The hours of operation of the school would be from 7:45 a.m. to 9:00 p.m., seven days a week.

50.     The students would attend classes, study, eat, pray and sleep at the educational facility.

51.     Although students and faculty will engage in regular prayer, as is required in the Orthodox Jewish faith, there will be no separate synagogue at the Kollel's planned facility, and no worship services would be advertised.

52.     The term "house of worship" is not defined in the Howell Township land use regulations.  However, the planned facility would not be a "house of worship," as that term is understood in the land use regulation context.

53.     Religious Jewish life is focused on Jewish education and such education is central to the religious practice of the individuals who would attend the Kollel's facilities.

54.     Religious Jews, including the Plaintiffs, believe that only by maintaining strong programs in Jewish education can the future of their communities be assured.

55.     Religious Jews trace this focus on Jewish education back to the Biblical Jacob, and see such study as being part of the unbroken history of their movement dating back several millennia to Jacob.

56.     By attending such a Jewish educational facility, these young Jewish men would be trained to be leaders in their religious communities, and would further their religious beliefs of becoming Torah and Talmud scholars.

57.     The Kollel cannot offer the *mesivta* and *yeshiva gedola* programs at its current facility in Lakewood.  The Lakewood Academy is 1600 square feet on two floors, and includes classrooms as well as a space for a *beit din*.  There is no housing offered on site.  There is no room for the *mesivta* and *yeshiva gedola* programs.

58.     The property where the Lakewood Academy is located, approximately ½-acre in size, cannot accommodate further expansion to house the *mesivta* and *yeshiva gedola* programs.

59. Without an additional facility, the Kollel cannot expand to offer the *mesivta* and *yeshiva gedola* programs and therefore cannot fulfill its religious mission to train more Torah and Talmud scholars.

60. Without the training facilities for its future religious leaders, the Kollel will be unable to meet the religious need for more community leaders.

61. Additionally, the Kollel requires dormitory facilities for the *mesivta* and *yeshiva gedola*. The Lakewood Academy does not currently have dormitory facilities, nor does it have space to construct these facilities.

62. The proposed facility will allow half of the *mesivta* students and all of the *yeshiva gedola* to live on-site, and therefore to study free from the distractions of their home communities, which the Kollel believes is important for their development as Torah and Talmudic scholars.

63. The Kollel believes that it is essential that students of the *yeshiva gedola* should be removed from the distractions of secular life so that they may concentrate on their studies, experience a community of dedicated religious practitioners and scholars, and single-mindedly devote all their attention to spiritual development and with appropriate models and guides as to how to live their lives in accord with the Torah.

64. The Kollel's plan to provide isolated, full-time communities for these studies and lifestyle is based on its religious beliefs. It is the Kollel's religious belief that students must study not only day and night, but with purity of intention and purity of behavior that is required. The Kollel believes that such purity is necessary for true religious study, for clarity of thought, refinement of character, ability to extrapolate one understanding from another, and practical application.

65.     The Kollel believes students should study with Rabbis who are teachers and mentors, who can give students the fullest understanding possible of the material, and who can see their reactions, gauge their comprehension and also serve as a role model of how to live these truths.  In order to fully engage in such learning from the character and behavior of the teachers, the Kollel believes that it is vital that *yeshiva gedola* students live in a religious scholarly community separated from secular life.

66.     The Kollel believes that teachers at a *yeshiva gedola* should be moral and spiritual examples to their students and closely supervise the students' moral and spiritual development. The inability to maintain a proper full-time environment for the students and to observe and supervise their conduct would burden that practice.

67.     The Kollel further believes that *mesivta* students also benefit from living in a religious scholarly community, and further benefit from residing in close proximity to *yeshiva gedola* students.

68.     Having dormitory facilities for students and on-site faculty housing would allow the faculty full-time supervision of the students' spiritual and moral development.

69.     The *mesivta* and *yeshiva gedola* will serve as a learning community.  The Kollel believes that students must not study on their own but be part of a learning community.

70.     The purpose of the faculty housing is to accommodate the needs of faculty whose religious beliefs prohibit them from walking on the Sabbath.

71.     The Kollel's proposed use permits some faculty members to reside on site to supervise the students and to be able to interact with the students for purposes of their religious education on the Sabbath.

72.     Therefore, in order to exercise its religious beliefs, the Kollel must have a location to house its *mesivta* and *yeshiva gedola* programs.

<u>The Subject Property</u>

73.     In the spring of 2015, the Kollel located property at 344 Ford Road, Block 69, Lot 5 as designated on the tax map of the Township of Howell (hereinafter "the Subject Property") as a site that would fulfill its needs to develop its *mesivta* and *yeshiva gedola* facility.

74.     Prior to the spring of 2015, the Kollel spent approximately two years in an effort to locate a suitable property, with the assistance of a real estate broker.

75.     Ultimately, the only property suitable for the Kollel's use was the Subject Property.

76.     Plaintiff Zebra Holdings II, LLC thereafter purchased the Subject Property.  The Kollel has a contract to purchase the Subject Property from Zebra Holdings II, LLC.

77.     The size of the Subject Property is 10.1 acres.

78.     The Subject Property is currently improved with a split-level single family residence, a stone/gravel driveway, a wood deck and above ground swimming pool and a large chicken coop.

79.     The Subject Property is located in the "ARE-2" zoning district.

80.     At the time that the Zebra Holdings II, LLC located and purchased the Subject Property and until 2016, "educational facilities" were a use permitted <u>by right</u> within the ARE-2 zoning district.

81.     The Kollel had a reasonable expectation of being able to construct its educational facility on the Subject Property.

82.     The Subject Property is uniquely suited for the educational facility use.

83.    The Subject Property would be in character with the surrounding neighborhood which consists of residential, institutional, agricultural, and nearby commercial land uses.

84.    The Lil'achievers Early Childhood Center, which offers preschool, kindergarten, camps and other childcare options with a licensed capacity of 60 children, is located at 326 Ford Road, approximately 250 feet from the Property.

85.    Upon information and belief, another school with approximately 100 students is located approximately 1500 feet from the Property, also within the ARE-2 zoning district.

86.    Most of Howell Township's public schools are located in the ARE-2 zoning district.

87.    Located in the Township's ARE-2 zoning district is the Howell North Middle School with approximately 814 students.

88.    Also located in the Township's ARE-2 zoning district is the Howell Memorial Middle School with approximately 668 students.

89.    Also located in the Township's ARE-2 zoning district is the Ardena School, with approximately 435 students.

90.    Also located in the Township's ARE-2 zoning district is the Griebling School, with approximately 501 students.

91.    Also located in the Township's ARE-2 zoning district is the Greenville School, with approximately 463 students.

92.    Also located in the Township's ARE-2 zoning district is the Ramtown School, with approximately 459 students.

93.    Also located in the Township's ARE-2 zoning district is the Howell Middle School South , with approximately 831 students.

94.   The Coastal Learning Center, a private school offering Grades 3 through 12, is also located in the Township's ARE-2 zoning district.

95.   The Subject Property is located approximately 0.4 miles from U.S. Route 9, which is lined with many commercial land uses such as gas stations and shopping centers.  A Valero gas station and an Amazing Savings grocery and housewares store are each located approximately .5 miles from the Subject Property.

96.   Also nearby are a wholesale building supply store, a Meineke Car Care Center, a cigar lounge, an American Uniform and Supply, a cafe, and other retail and commercial establishments.

97.   The Subject Property is also less than 2,000 feet from two different shopping centers.

98.   The Kollel proposes to construct a two-story, 17,240 square foot classroom building, with a basement, in which to conduct Jewish studies; a two-story 19,186 square foot dormitory building with a basement; and seven attached two-story townhouses to be used for faculty housing.  The proposal calls for the existing split-level frame dwelling on the site to remain for faculty housing and for the existing chicken coop to be removed.  A paved drive will provide access to the site and 41 off-street parking spaces are proposed.

99.   The proposed facility would meet the Kollel's religious needs and allow it to operate the *mesivta* and *yeshiva gedola* as described above.

### The Applicable Land Use Regulations and State Statutes

100.   The use of the Subject Property is subject to the laws and regulations of Howell Township and the State of New Jersey.

101.   Howell Township regulates zoning within its borders through the Township of Howell Zoning Ordinance (the "ZO").

102.   Section 188-50 of the ZO, entitled "Conformity to regulations required," provides: "No land, lot or premises and no building or structure shall be used for any purpose other than those permitted by Articles VIII through XI for the zone in which it is located."

103.   Permitted principal uses as of right in the ARE-2 Zone include agricultural uses, single-family residential, municipal buildings, public recreation and group homes.

104.   From the time when Zebra Holdings II, LLC purchased the Property to January 25, 2016, "Educational Facilities" were also a use permitted by right in the ARE-2 zone.

105.   Permitted accessory uses in the ARE-2 zone include "Accessory uses customarily incidental and ancillary to a permitted use" and "Home occupations."

106.   Permitted conditional uses in the ARE-2 zone are "Houses of worship," "Community residences for the developmentally disabled and community shelters for victims of domestic violence that contain more than six and fewer than 15 occupants," and "Solar energy generation facility."

107.   On March 20, 2007, the Township adopted Ordinance No. O-07-09, which permitted "Educational facilities" as a principal permitted use in the ARE-2 zoning district.

108.   Ordinance No. O-07-09 stated that it adopted a new Land Use Plan Element of the Township's master plan on April 27, 2006, and that the Township was adopting Ordinance No. O-07-09 in order to effectuate the master plan.

109.   The 2006 Land Use Plan Element stated: "educational facilities should be designated as a permitted use."

110.   The Plaintiffs' proposed use is an educational facility.

111.   On January 3, 2006, the Township Council of the Township of Howell adopted Resolution R-06-18, which appointed an individual as a "grants consultant" to assist the Township to acquire certain grants.  Resolution R-06-18 stated in part:

> WHEREAS, the Township desires to obtain general assistance in grants management to help the Township acquire various grants included, but not limited to, infrastructure investment, beautification, open space projects, <u>educational facilities</u> and walkway bikeway improvement; . . . .

(Emphasis added.)

112.   Upon information and belief, the Township was seeking funding for educational facilities in 2006 when the Township Council for the Township of Howell unanimously passed Resolution R-06-18 by which it allocated funds for the hiring of a grants management coordinator "to obtain general assistance in grants management to help the Township acquire various grants included, but not limited to, . . . educational facilities . . . ."

113.   The State of New Jersey provides grants for "educational facilities" through the New Jersey Educational Facilities Authority and N.J.S.A 18A:72A-1 *et seq.*

114.   N.J.S.A. 18A:72A-3 defines an "Educational facility" as

> [A] structure suitable for use as a <u>dormitory</u>, dining hall, student union, administration building, academic building, library, laboratory, research facility, teaching hospital, and parking maintenance storage or utility facility and <u>other structures or facilities related thereto or required or useful for the instruction of students</u> or the conducting of research or the operation of an institution for higher education, and the necessary and usual attendant and related facilities and equipment, but shall not include any facility used or to be used for sectarian instruction or as a place for religious worship; . . . .

(Emphases added.)

115.   N.J.S.A. 18A:72A-3 defines a "Dormitory" as "a housing unit with necessary and usual attendant and related facilities and equipment, and shall include a dormitory of a public or private school, or of a public or private institution of higher education; . . . ."

116. Dormitories are educational facilities.

117. Additionally, dormitories are "customarily incidental and ancillary to" an educational facility, and therefore could also be permitted under the ZO as an accessory use.

118. Dormitories are customarily incidental and ancillary to educational facilities.

119. Faculty housing is customarily incidental and ancillary to educational facilities.

120. On January 25, 2016, "Educational facilities" were removed as a permitted use within the ARE-2 zone by Howell Township Ordinance No. O-16-01.

121. The Township adopted Ordinance No. O-16-01 after the Plaintiffs had applied for zoning approval for their educational facility, as described below.

122. The removal of "educational facilities" as a permitted use within the ARE-2 zone was the only change to the ZO caused by the adoption of Howell Township Ordinance No. O-16-01.

123. The Township adopted Ordinance No. O-16-01 specifically to target ultra-Orthodox Jews in general and the Plaintiffs in particular.

124. The phrase "educational facilities" is not defined by the ZO.

125. Examples of "Educational Facilities" that have received funding from the New Jersey Educational Facilities Authority include the Beth Medrash Govoha, Yeshiva Gedolah of Bayonne, Talmudical Academy, the College of Saint Elizabeth, the Princeton Theological Seminary, the Rabbinical College of America, Saint Peter's University and Seton Hall University, each of which is a religious school affiliated with a particular religious movement.

126. The Kollel's proposed use was a permitted principal use on the Property prior to January 25, 2016, and at the time of its application.

127.    New Jersey adopted the "time of application rule," N.J.S.A. 40:55D-10.5, which states:

> Notwithstanding any provision of law to the contrary, those development regulations which are in effect on the date of submission of an application for development shall govern the review of that application for development and any decision made with regard to that application for development. Any provisions of an ordinance, except those relating to health and public safety, that are adopted subsequent to the date of submission of an application for development, shall not be applicable to that application for development.

128.    Therefore, the prior provision of the ZO permitting "educational facilities" in the ARE-2 zoning district is applicable to the Plaintiffs' application.

129.    The ZO contains separate provisions regarding the land use regulation of "Schools with state-approved curricula."

130.    The Kollel's proposed use is not a "school with state-approved curricula."

131.    "Schools with state-approved curricula" were permitted as a "conditional use" within the ARE-2 zone prior to May 20, 2014.

132.    In early 2014, a contentious zoning application was being reviewed in nearby Jackson, New Jersey, related to a proposed Orthodox Jewish girls' school.  The school's zoning application was not approved amidst intense community opposition.

133.    Jackson Township is adjacent to Howell Township. Both Howell and Jackson border Lakewood, N.J., which has a large ultra-Orthodox Jewish population.

134.    The Subject Property borders Lakewood.

135.    As described below, there is great hostility in the Howell community toward ultra-Orthodox Jews.  Many Howell residents have published statements indicating a desire to prevent ultra-Orthodox Jews from Lakewood from moving into Howell.  On a "closed" Facebook page discussing Plaintiffs' application, one resident opined that, "Im afraid our town will become like Lakewood. I'll bet Lakewood was nice once upon a time."  Another opined, "We were successful

in Jackson only because it was not a necessity yet. Now that our towns are being occupied by the residents who will benefit from the schools it becomes much harder to fight them They will become 'inherently beneficial to the residents.'"  Others stated, "People don't want their town ruined!" and "The beginning of the end of our town."

136.   On May 20, 2014, the Township Council adopted Ordinance No. O-14-13, which revised the requirements for schools within the Township and severely restricted where they could locate.

137.   Ordinance No. O-14-13, together with its attendant changes to the conditions required for the approval of a school within Howell Township, was motivated by animus toward ultra-Orthodox Jews.

138.   Ordinance No. 0-14-13 prohibited "schools with state-approved curricula" as a permitted or conditional use within the ARE-2 zoning district, among several other zoning districts.

139.   Ordinance No. O-14-13 prohibited outright any school from having dormitory or boarding facilities.  Section 188-93 of the ZO now states: "expressly prohibited is dormitory housing which is defined as a a [sic] building used as group living quarters for a student body."

140.   Ultra-Orthodox religious schools often provide boarding facilities.

141.   The revision introduced a requirement that all schools be licensed by the State of New Jersey.

142.   The Kollel does not meet the requirement of being licensed by the State of New Jersey.

143.   The revision also introduced a requirement that the curriculum of the school "be approved" by the New Jersey Department of Education.

144.    The Kollel does not meet the requirement of its curriculum being approved by the New Jersey Department of Education.

145.    The Kollel does not and cannot meet the requirements for a school within the Township.

146.    Plaintiffs' proposed use is not a "school" under the Township's ZO.

147.    The revision also introduced unreasonably high "minimum lot area[s]" of 30 acres for a high school and 50 acres for an institution of higher learning, plus one additional acre for each 100 students.

148.    The revision also contained various other onerous restrictions designed to prevent schools from locating in Howell Township.

149.    Such restrictions were motivated by hostility toward the ultra-Orthodox Jewish community.

150.    The Kollel's proposed use meets the bulk and dimensional requirements for "educational facilities" in the ARE-2 zoning district, which include a minimum lot area of two acres, minimum lot width of 200 feet, lot depth of 200 feet, setback requirements, maximum lot coverage of 15% and building coverage of 12%, and building height of 35 feet.

151.    Section 188-56 of the ZO states:

> Only one principal building may be erected on a lot except for related compatible buildings constituting one basic use or operation under one management. This exception shall be limited to the following uses:
>
>    A. Planned residential or multifamily developments.
>
>    B. Public or institutional building complexes.
>
>    C. Retail facilities as regulated in this chapter.
>
>    D. Industrial or manufacturing building complexes.
>
>    E. Farms.

19

F. Planned developments.

G. Solar energy generation facility.

H. Gasoline station and convenience center.

(Emphasis added.)

152.   The Kollel's proposed educational facility is an "institutional building complex."

153.   A "dwelling unit" is defined in the ZO as "A room, or suite of two or more rooms, which is designed for, intended for or occupied by one family living as an independent unit doing its own cooking."

154.   A "Family" is defined in the ZO as "One or more persons related by blood, adoption or marriage, living and cooking together, as a single housekeeping unit, exclusive of household servants. A number of persons, but not exceeding two, living and cooking together as a single housekeeping unit though not related by blood, adoption or marriage, shall be deemed to constitute a family."

155.   A "dwelling, multiple" is defined in the ZO as "A building containing more than two dwelling units."

156.   The Kollel's proposed student dormitory building is not a "dwelling, multiple," as it would not contain "more than two dwelling units."  The dormitory building would not contain any "dwelling units."  The dormitory rooms would not be occupied by one "family" living as an independent unit doing its own cooking.

157.   If the Kollel's proposed use is not considered an "educational facility," then it is prohibited throughout the Township's jurisdiction as it would not be a permitted use in any zoning district.

158.   Various nonreligious assembly and institutional land uses are permitted in the ARE-2 zoning district and/or elsewhere within the Township, including "public recreation facilities," "municipal buildings and other public-purpose buildings owned by the Township," "community theaters and playhouses," "entertainment uses," "hospitals," "medical centers," "day-care facilities," "recreational facilities," among others.

<u>The Kollel's Land Use Application</u>

159.   On August 19, 2015, the Kollel filed a Land Use Permit Application and concept plan with the Township of Howell, Department of Community Development and Land Use seeking zoning confirmation that the Kollel's proposed educational facility is a permitted use within the ARE-2 zone as set forth in Section 118-69.1B(1)(b) of the ZO.

160.   On August 31, 2015, the Howell Township Director of Land Use (the "Director") issued a decision on the Plaintiffs' application.

161.   The Director determined that the non-residential component of the Plaintiffs' proposed use was permitted, writing: "This property is located within the ARE-2 zoning district and while educational facilities are a permitted use within the zone, student and faculty housing are not."

162.   However, the Director denied the Kollel's application and determined that the Kollel "must make application to Zoning Board of Adjustment for a use variance as per N.J.A.C. 40:55D-70(d)," for two reasons.

163.   First, the Director made the determination that, although educational facilities are a permitted use within the ARE-2 zone, student and faculty housing are not.  Thus, he indicated that the Kollel must apply for a use variance in order to construct the housing components of the use.

164.   Second, the Director made the determination that the concept plan reflected four principal structures, and he opined that only one is permitted on a lot.  He therefore indicated that Kollel must also submit an application for a use variance before the Howell Township Board of Adjustment if it wished to pursue building this educational facility use of the Subject Property.

165.   Both of these determinations were in error.

166.   These determinations were motivated by hostility toward ultra-Orthodox Jews.

167.   As described below, the determination was made during a time of significant hostility toward ultra-Orthodox Jews from the Howell Township community.

168.   As set forth above, the housing component of the proposed educational facility is a recognized component of educational facilities in New Jersey.

169.   The proposed student and faculty housing at the Subject Property is also a permitted accessory use of the property pursuant to sections 188-4, 188-69(B)(2) and 188-69.1(B)(2) of the ZO as the housing component is subordinate, customarily incidental and ancillary to the educational facility.

170.   The educational facility is an "institutional building complex," and therefore exempt from the prohibition against multiple principal buildings on its face.

171.   On September 18, 2015, pursuant to N.J.S.A. 40:55D-70a and 72a, the Kollel filed an appeal of the August 31, 2015 decision of the Howell Township Director of Land Use to the Howell Township Zoning Board of Adjustment on the basis that student and faculty housing is part of the principal educational facility use of the property, alternatively that these uses are a permitted accessory use of the property, and that the four structures proposed on the property constitute a permitted institutional building complex.

172.   As alternative relief, the Kollel sought a variance pursuant to N.J.S.A. 40:55D-70c and to permit an educational facility that includes student and faculty housing and to permit more than one principal structure on the property.

173.   The Kollel indicated in its appeal and application that it was bifurcating its site plan application pursuant to N.J.S.A. 40:55D-76 and it was to be submitted at a later date.

174.   The Board engineer, John J. Mallon, deemed Kollel's Appeal and alternative variance application complete and issued a review letter on October 30, 2015.

175.   The Engineer noted that the appeal addressed the two issues of whether student and faculty housing is permitted as part of an educational facility and whether four principal structures are permitted on the property in the absence of a variance application.

176.   In addition to meeting the criteria required by state statute for the alternative variance relief sought, the only substantive item raised by the engineer with respect to the application was the need for a variance from section 188-63A of the Township of Howell Land Use Ordinance which requires a 50 foot wide buffer separating the proposed use of the property from the existing homes across the street.

177.   Other issues raised by the engineer in his review letter addressed site plan issues that were not within the jurisdiction of the Board with respect to the Appeal and alternative variance relief application.  These included water and sewer needs of the property, road widening, delivery and refuse area at the property, fire access, and tree clearing.

178.   While the appeal and application were pending, the Board solicited comments from several Township governmental bodies regarding the Kollel's appeal and application.

179.   On or about November 19, 2015, the Howell Township Farmers Advisory Committee Board held their monthly meeting.  The stated purpose of the Advisory Committee

Board is to "support Howell Township's Master Plan Land Use Element objectives associated with the PRESERVATION of agriculture, through our "application" analysis and "ordinance" review, so as to sustain suitable conditions for the continued operation and maintenance of ARE type acreage."

180. The Kollel's appeal and application was one of nine reviewed by the Advisory Committee Board at that meeting.  It was the only application not approved based upon a finding that the educational facility proposed does not meet the permitted uses of the ARE-2 zoning district as it is a "school."

181. On December 12, 2015, the Howell Township Recycling Coordinator approved the Kollel's appeal and variance  application.

182. On December 14, 2015 on a document entitled "Howell Township Fire Bureau Site Plan Review," the Township Fire Bureau indicated it had three concerns:  fire sprinklers to be installed in each building, that fire lanes would have to be designed with approval, and off-site water main extensions and fire hydrants would need to be approved.

183. On November 18, 2015, on a document entitled "Site Plan Review," the Township Shade Tree Commission indicated that it was rejecting Kollel's appeal and application in the absence of a landscape plan.  Out of the nine applications considered, Kollel's was the only one rejected.

184. The Kollel's appeal and application were scheduled for a first hearing on December 21, 2015.

185. The Kollel presented one witness at the December 21, 2015 hearing, Zeev Rothschild, the President of Plaintiff Kollel, in order to describe the proposed educational facility use.

186.   The purpose of the December 21, 2015 hearing, and the subsequent hearing described below, was solely to determine the Plaintiffs' appeal of the Director's decision regarding whether the proposed use is permitted at the Subject Property.

187.   It became clear that the Board and its professionals were irrationally hostile to the religious nature of the proposed use, attempting to describe the use as a "synagogue" rather than an educational facility, which further demonstrated hostility toward the ultra-Orthodox character of the Plaintiff Kollel.

188.   At the December 21, 2015 hearing, the Township's Planner attempted to convince the Board that the educational facility would include a place of worship.  Specifically:

> MS. BEAHM: Are you proposing a synagogue or a temple on the site, too?
>
> THE APPLICANT: The synagogue is -- the school has prayers and they will have it in the study room that's in the educational facility. It will have prayers in the large study room that is there. It's not a general synagogue that's open for the public. It's open for the students that are there. If the public wants to join, the public is invited. They are allowed to join. I'm not telling people not to come, but the facility is primarily made for the students and it's not encouraged that other people will come.
>
> MS. BEAHM: But you're not blocking it off to other members of the public should they want to come there and worship?
>
> THE APPLICANT: That's correct.
>
> MS. BEAHM: So in addition to educational facilities, you're also having a pseudo house of worship on the property?
>
> THE APPLICANT: We don't mind, if the Board wants to restrict it, that it shouldn't be open to the public, we don't have a problem with that. We're not, ourselves, we wouldn't generally in our religion we restrict it from the public but if the board feels that's necessary we don't mind living with that restriction.

(Emphasis added.)

189.   In followup, Board member John Armata asked, "That study room would be considered a synagogue during that prayer time?"

190.    Rabbi Rothschild testified that the students would pray at certain set times during the day as one component of their study, although the course of study would primarily include lectures and study with a partner, a traditional form of Orthodox Jewish Talmudic study.

191.    Mr. Armata then asked:

> MR. ARMATA: So there's no sermon, per se, of a leader, in a rabbi, that leads this group in prayer and then some comments, a sermon or whatever?
>
> THE APPLICANT: That is correct. There is no such thing.
>
> MR. ARMATA: So there is just a bunch of students praying?
>
> THE APPLICANT: Correct.

192.    Board Member Sanclimenti also asked Rothschild: "Is this school open to anyone outside of your religion?"  Such question is wholly irrelevant in terms of the zoning appeal.

193.    Members of the public also asked about the potential for a house of worship on the Subject Property:

> R. RICHARDS: I will rephrase that then.
>
> All right.
>
> You already said there will be no house of worship. Are there any plans in the future to include a house of worship?
>
> THE APPLICANT:  No.
>
> MR. KELLY: I'm going to assume that the families will have bussing, correct?
>
> THE APPLICANT: Correct.
>
> MR. KELLY: And no formal synagogue on premises, correct?
>
> THE APPLICANT: Correct.

194.   After questioning by the Board and its professionals, the Board permitted various members of the public to question Rothschild, despite the fact the Board was only ruling on a legal determination as to whether the use was permitted in the ARE-2 zoning district.

195.   Other questioning by members of the public indicated significant hostility toward the Kollel and its application, addressing issues such as tax exemption that were irrelevant to the proceedings.  Such questions and statements included:

- "The question I have is, is that, the result of any of the things going to cost me money?"

- "The other question was whether or not the decisions affect whether or not they'll have to spend money."

- "Chances are, this will cost me money."

- "Would you be seeking property tax relief under a religious -- . . . ."

- "I'm going to assume that the families will have bussing, correct?"

196.   Another Howell Township resident who questioned Rothschild for the longest period of time, introduced the incorrect argument that the proposed use was a multi-family residential development, asking: "[W]ould you consider someone who lives in a residence like that for seven years living in a dormitory or just being a residents in, like, a home? . . . .  Well, do the students pay rent?  THE APPLICANT:  No, the students pay tuition. . . .  And will there be residents on the property as well?  THE APPLICANT: No."

197.   That resident further asked "Are there any plans in the future to include a house of worship?"

198.   Upon information and belief, that same resident made the following statements on social media websites:

- "This was very interesting. Especially the 'they want more and more of our money.' So I guess we should cut off WIC and food stamps, right?"

- "The state appointed an oversight person for the school board which is now primarily orthodox...I wonder how that would play with this article today. The key for me is, and I've known it all along, is that the Hasidic community will never recognize the existence of people outside their circle, will continue to cry persecution and still not understand why they are looked at the way they are. There was a movie, Defiance,[1] that has a scene in it which was telling. An orthodox jew in the movie sits and asks Daniel Craig, who is not jewish in the movie, why they have been picked on. The person asking cannot see that in the way they treat "outsiders" is part of the reason. And, interestingly, in the movie, they refuse to raise a hand to defend themselves, rely completely on the main characters to do all the fighting and tough work, but in many ways do not recognize how valiant the efforts of Daniel Craig's and the other characters are. I forget all the details, but there is a scene where the people complain about that the people defending them are making them move and work hardThey are oblivious to the risk the main characters are in.."

- "Howell has a very long history of Jewish residents. In the 1950s they were one of the US largest egg producers, and actually had most of the farms here. Lakewood has always had a large Jewish population, just not Hasidic."

- "Any good journalist who researches those two communities will note that one particluar [sic] religious community, the Satmar, are about to populate a town of 400 with nearly quadruple that in a very short time. And the Satmar community is highly insular, only doing business or interracting [sic] primarily with Satmar businesses. Meaning a huge investment in town infrastructure by current taxpayers to support a community and expansion that they have little or no interest in, that will exclude them in a large way, and also quickly control the government and shut out the original residents even more."

- "While that seems to paint a community with a broad brush, one only need research Lakewood, Ramapo and Bloomingburg NY to understand."

- "I am going to tell you that if you truly want to understand what is going on here, you need to deepen your research, as any good reporter would. First, you need to understand Beth Madrash Gohova, the largest Yeshiva in the world and based in Lakewood. You need to understand and read how the rabbinical court works, as it is used in this community and endorsed in many of its rulings by the State of NJ."

- "Hasidic is NOT orthodox judiasm [sic]. While often referred to as such, it is not. Of the 10,000 years of the Jewish faith, it has only been around a

---

[1] The 2008 movie "Defiance" focuses on three Belarusian Jewish brothers, including one played by Daniel Craig, who lead a community of Jews who have fled to the woods in order to escape German *Einsatzgruppen* during World War II. Upon information and belief, the exchange cited by is about the reasoning behind the Holocaust.

mere 250 years. And before you comment more, as a reporter do your homework on the plight of Lakewood. Research the effects of the community on the schools and government. Dig in to why the state had to take over the schools. Go spend a day shopping at Greenbow/Goldmont plaza., if you can. Howell has a long history of Jewish residents, and of an integrated Jewish community. Not antisemetic [sic] in any stretch. Even in Israel there are concerns about how the hasidic community conducts itself."

- "Well, as I may not have lived in it, but I've been to the Holyland more then [sic] most of the Hebrew persuasion, I'd love to know if she thinks that I misunderstand putting 300 people on a small lot in a farm neighborhood is just a simple difference in cultures. I appreciate her reaching out. Hasidic worship is only 250 years old. The newest and youngest of all the sects of Judiasm [sic]. And one that while 'pure', refuses to assimilate in even the smallest of ways, which would make coexisting simple. Can she explain why we must bend to accomodate [sic] a culture that does not accomodate [sic] any of us?"

199.   As this resident also wrote: "We as a small neighborhood are pretty organized. Obviously the more people start showing up, especially to the ZONING board meetings, the more it will place fear into the board members to do the right thing."

200.   This resident also wrote: "I have a direct line to the deputy mayor. While he personally may understand, this issue has far outgrown the town council and its makeup to handle."

201.   Another resident also questioned the Applicant about a synagogue being on the Subject Property.

202.   Upon information and belief, the same resident made a statements on social media to "Stop selling," and such statement referred to selling property to ultra-Orthodox Jews.

203.   The questioning and statements of the public demonstrated specific hostility toward ultra-Orthodox Jews, as issues such as tax exemption, bussing, and governmental subsidies are frequently used as proxies for anti-Semitic sentiment by the Howell Township community.

204.   The Board held a second hearing on the Kollel's appeal on February 29, 2016.

205.   The Kollel presented the testimony of its professional planner, Andrew Janiw, further explaining the use and the fact that educational facilities include dormitories.

206.   The Board exhibited significant hostility toward Janiw.  For example, while it is appropriate to review other jurisdictions' definitions of terms that are not defined in the jurisdiction at issue--as is the term "educational facility" in Howell--the Board's responses to Janiw's attempt to do so included "It's a specious argument," "Not relevant" "You're making it up," and "Why don't we use one from Massachusetts where I'm from."

207.   At the February 29, 2016 hearing, the Board and its professionals continued to demonstrate hostility toward the Applicant based specifically on the <u>religious</u> nature of its use.

208.   Director Jackson stated that the use was not an educational facility because there would be "religious education."

209.   In response to the Kollel's Planner's testimony regarding the definition of an educational facility as set forth above, the Township Planner replied:

> So let's talk about this New Jersey statute. So I'm struggling. You put this up here to try to further your cause, but yet the last sentence basically negates your use. Shall not include any facility used for sectarian instruction or a place for religious worship, which is basically --
>
> THE CHAIRMAN: Hold your applause, please.
>
> MS. BEAHM: Which is --
>
> THE WITNESS: We are an educational facility. We are not a synagogue. We are not a place of religious worship.
>
> MS. BEAHM: Were you not here at the last meeting?
>
> THE WITNESS: I was.
>
> MS. BEAHM: Okay. So I'm just going to go back to my notes because we talked about the fact that there is going to be worship here, and that was right out of your applicant's testimony. This is a religious school, correct?
>
> THE WITNESS: It is a Jewish school. Part of the Jewish education process --
>
> MS. BEAHM: So sectarian?

THE WITNESS: It is a Jewish school.

MS. BEAHM: Okay, so you're just going to pretend like that doesn't mean religious, right?

THE WITNESS: No, no. Well, I would all -- if you'd allow me to proceed with the second definition --

    . . . .

MS. BEAHM: . . . .  So then we're going back to the definition that you pulled out of New Jersey statute, which in the last sentence says shall not include sectarian instruction or as a place of worship, . . . . So I don't even think this should be utilized as appropriate because -- or we can because it basically says educational facilities don't include what they're proposing.

THE CHAIRMAN: Correct.

210. The Township Planner later interrupted the Kollel's attorney's attempt to continue his direct examination of the Kollel's planner by giving her own opinions to the Board:

MR. COSTA: Can you go through the history of how this term came to be put into the Howell ordinance.

MS. BEAHM: Excuse me, Mr. Chair.

THE CHAIRMAN: Jennifer, do you have any rebuttal on this?

MS. BEAHM: I mean, I don't agree. I think this is a multifamily housing project, which we don't permit in the zone, and a school, which we do allow in certain zones under specific conditions that this application doesn't meet. I think the definitions that were read into the record are in direct conflict with the testimony that we heard at the last meeting on how this facility would operate. It's a religious school. . . .

211. The Township planner further stated:

At the end of the day, we do not allow multifamily housing in this area. I mean, we just don't. And to that end, this is not something that's been neglected. The planning board has consistently been evaluating their master plan. They have master plan subcommittee meetings monthly. We just did the latest amendment to the master plan I think it was in 2014, and we looked at -- and I will tell you and Chris can attest to the fact that that committee drove every road in town, looked at everything in town, and we looked at every area, and this area was determined to stay ARE-2. You

know, this is in our agricultural zones. It's not in the R-5, which allows for multifamily.

212.    The Township planner's conclusion that the proposed educational facility was a "multifamily housing project" is contrary to logic and the Township's own ZO as described above, and was motivated by hostility toward ultra-Orthodox Jews.

213.    Additionally, Rothschild stated during the hearing that the Kollel would forego the faculty housing if that was required to have the project approved.

214.    Director Jackson attempted to confound the separate land uses of "educational facility" and "school" to the Board by stating: "Regarding the master plan, it clearly states and under our ordinance that schools, you know, educational facilities, whatever you want to call them, are supposed to be located on a collector or an arterial road."

215.    Director Jackson's statement was false, as there is no such requirement of collector or arterial road access for "educational facilities."

216.    Director Jackson further admitted that his prior decision regarding dormitories being prohibited as part of an "educational facility" use was based solely on his substituting the requirements for educational facilities with those for "schools."  He stated at the February 29, 2016 hearing: "Secondly, regarding the dormitories and everything like that, under our ordinance right now, under our conditional uses with regard to schooling, dormitories are not permitted uses at all so that's where my denial came from with regards to having dormitories and multifamily housing on that lot."

217.    Another Board member yet again attempted to describe the proposed use as a synagogue: "MS. O'DONNELL: Yeah, I have a question. Out of the four principal buildings, which building will be used for worship?"  Rothschild again testified that "[t]here is no specific place that's exclusive for worship."

32

218.   In response, Board member Armata offered his own definition of what constitutes a Jewish house of worship:

> What does a synagogue constitute? I read up a little bit about it. You need 10 people who are orthodox to meet, to have a Torah, and that's it. That's the beginning of the prayer in a synagogue, and a synagogue doesn't have to be like a church-like building. It can be this room. I've got them right here. In many places I found that. So, you know, let's call a spade a spade and not the hype --

219.   In response, Rothschild was again sworn and again responded to questions from the Kollel's counsel:

> Q. And however, it is not a synagogue open to the public; is that correct?
>
> A. Right. We said when they do prayers and people want to come in from the outside, no one is excluding them, but it's not made for the general public.
>
> THE CHAIRMAN: Yeah, but -- but outside orthodox would be welcome there if they so choose to come and pray there.
>
> THE WITNESS: We don't -- we try not to exclude. . . .

220.   The Township's Planner then falsely stated that, according to the submitted plans, "there's a very clear location on these plans that says worship room." There was no such location in the plans.

221.   Board member O'Donnell responded by stating:

> So just to dovetail what I asked, it would seem to me that <u>if we had places of worship</u>, then, in fact, this is not just an educational facility in the terms that we generally use with schools, public schools, or colleges or universities, however far we stretch it.

(Emphasis added.)

222.   The uncontradicted evidence demonstrates that the proposed use would not constitute a house of worship:

> There is no room in the building that's specifically for prayers or anything else like that. There is a beis midrash if you look on the plans. It doesn't

say anywhere worship room. Beis midrash means by definition a place where people study. Midrash is a place -- it's a house where people study. It's not -- in Jewish law there's a specific distinction between a beis midrash and a beis hakeneset. Beis hakeneset means a synagogue, a shul, a synagogue. Beis midrash means someplace where people study, and it specifically does not mean -- the laws, the Jewish law of what's permitted in a synagogue and what's permitted in a beis midrash are two completely separate laws on two separate things. They have nothing to do -- they have nothing -- it's not the same thing at all.

. . . .  I go someplace, I have to pray because that's my religious tenants dictate, the same way as Protestants do, the same way as Christians do, the same as many other people do. The people who are in this building, since they're in this building, they have -- and they are Jewish, they have to pray, it's true, but there's no room and there's no specific room for this. They will pray in the beis midrash because that's what the largest room for gathering is, but those are -- there are classes, there are normal classes, . . . .

I don't know where anybody would say that it says in here worship, place of worship. That's incorrect. And I don't think the definition -- I don't understand why you would understand that the definition that they're saying that this is a place for prayers. This is not a synagogue. It's not a religious institution. It's an education institution.

223.    Again, the Township's planner questioned the Kollel about the religious nature of the program: "MS. BEAHM: But it's a religious school, correct?  THE WITNESS: It is a religious school.  The fact that --  MS. BEAHM: You basically said it's for the study of the Talmud."

224.    The contentious and repetitive questioning by the Board and its Planner demonstrate animus toward ultra-Orthodox Jews.

225.    The Board thereafter unanimously voted to uphold Chris Jackson's denial based on the information in the August 31, 2015 letter.

226.    The Board issued its Memorialization of Resolution on March 28, 2016.

227.    In summarizing Rothschild's testimony, the Board noted that, "[a]lthough not a traditional synagogue, prayer services are part of the proposed facility."

228.    The Board's Resolution, like its questioning during the hearings, focused on the religious nature of the educational facility.

229.   The Board reasoning for the denial of the appeal included:

> The state statute which was relied upon by Applicant during the hearing specifically excluded the very type of facility which was proposed. Upon discussion by the board, the Applicant attempted to clarify the nature of the facility, but essentially admitted it was a school for sectarian instruction.
>
> Although educational facilities are not defined in the Howell Land Use Ordinance, the Board was guided by the definition of school, which expressly prohibits dormitories, location on a non-collector road, and must have state approved curriculum.
>
> Based upon the conflicting testimony of the Applicant's witnesses, the Board determined that the proposal essentially consisted of a school, with multi-family structures for students, and faculty for their families, which is clearly prohibited in this zone. It rejected testimony indicating that the proposal consisted an institutional building complex which would make it an exception under the ordinance governing multiple buildings on a single lot.

230.   The Resolution states that Board member O'Donnell, who moved to deny the appeal, believed that "sectarian instruction" prevents the proposed use from being considered an "educational facility."  The Board unanimously agreed.

231.   The Board's and the Township Planner's focus on the religious character of the educational facility, specifically on their belief that the proposed use was a "synagogue" and on the fact that students may engage in prayer, demonstrates that the Board treated the Plaintiffs on less than equal terms as nonreligious institutional and assembly uses.

232.   However, the Board's Resolution contained a finding of fact that the Kollel "would accept a restriction [to close any prayer activity to public participation] from the Board if required."

233.   The Board's reliance on its belief that the proposed use involved "sectarian instruction" to determine that the use was not an "educational facility" treated the Plaintiffs on less than equal terms as nonreligious institutional and assembly uses.

234.   The Board also concluded that a dormitory was a "multi-family structure" (and therefore prohibited) despite the clear inconsistency of this conclusion with the Township's ZO.

235.   The undisputed evidence provided to the Board indicated that there would not be separate cooking facilities in the dormitory units, and that "[e]very dormitory room will have at least three people in it, three student[s] in the room."

236.   The undisputed evidence also demonstrated that food service would be catered from outside vendors, not prepared in individual units.

237.   The Board's determination that the dormitory component of the proposed use was a "multi-family structure" was substantially motivated by hostility and animus toward ultra-Orthodox Jews.

238.   The Board's determination that the dormitory component of the proposed use was a "multi-family structure" resulted from the Board's responsiveness to the local Howell Township community, which possesses substantial hostility and animus toward ultra-Orthodox Jews.

239.   The Board also concluded that the educational facility was not permitted because of its religious nature, which clearly discriminates against religion in general and against ultra-Orthodox Jews in particular.

240.   The Board provided no explanation as to why the proposed use was not an institutional building complex.

241.   The Board's determination that the proposed use was not an institutional building complex was substantially motivated by hostility and animus toward ultra-Orthodox Jews.

242.   The Board's determination that the proposed use was not an institutional building complex resulted from the Board's responsiveness to the local Howell Township community, which possesses substantial hostility and animus toward ultra-Orthodox Jews.

243.   Prohibiting Plaintiffs from developing the Subject Property with more than one principal building, while permitting "Public or institutional building complexes" to contain more than one principal building treats the Plaintiffs' proposed religious use on less than equal terms as nonreligious assembly and institutional land uses.

244.   In denying the Kollel's appeal, the Board was knowingly responsive to the substantial Howell community hostility and animus toward ultra-Orthodox Jews.

245.   The Board also heard the uncontradicted testimony of the Applicant that there would be no "state regulated curriculum," as asked by the Chairman of the Board.  Additionally, the Township's Planner stated: "It's not -- we asked specifically if it had a state approved curriculum.  It does not.  It is not open to the general public."  Therefore, the use does not fall within the definition of a "school" under the Township ZO.

246.   The Board's Resolution included a finding of fact that the Kollel's "planner admitted that Applicant's proposal would not meet the definition of school as set forth in Howell Ordinance 188-93, . . . ."

247.   The Board's Resolution also included a finding of fact that the Board's planner "indicated that the facility does not meet the definition of Schools, as set forth in Section 188-93, as the curriculum is not state approved, and dormitories are expressly prohibited under this ordinance section."

248.   Nevertheless, the Board's Resolution unreasonably stated "In this case, the Board carefully weighed the proposal and based upon its analysis, determined that the proposal was a school, which is not permitted in this zone."

249.   The Board's conclusion that the proposed use was a "school" was contrary to the unrebutted testimony of both its own planner and the Kollel's planner, and to the text of its own ZO.

250.   The Board's determination that the proposed use was a "school" was substantially motivated by hostility and animus toward ultra-Orthodox Jews.

251.   The Board's determination that the proposed use was a "school" resulted from the Board's responsiveness to the local Howell Township community, which possesses substantial hostility and animus toward ultra-Orthodox Jews.

252.   Furthermore, the Township's 2014 Ordinance amendment severely restricting "schools" and placing unreasonable restrictions on such use was motivated by hostility toward ultra-Orthodox Jews.

253.   The Board's attempt to re-define the Plaintiffs' proposed educational facility as, alternatively, a "synagogue," "multi-family housing," and a "school," despite the clear inconsistency between the proposed use and such other uses, was motivated by hostility and animus toward ultra-Orthodox Jews.

254.   The Board's decision was a final and appealable administrative action.

255.   The Plaintiffs had 45 days after publication of the Resolution to appeal the Board's decision under New Jersey law.

256.   If Plaintiffs had not challenged the Board's decision, they would have been time-barred from doing so.

Hostility Toward Orthodox Jews in the Township

257.   The Director and Board's decisions against the Kollel were directly responsive to substantial hostility by the Howell Township community against ultra-Orthodox Jews.

258.   Many members of the Howell Township community harbor animus toward ultra-Orthodox Jews in general and toward those living in nearby Lakewood, N.J. in particular.

259.   Many members of the Howell Township community fear that ultra-Orthodox Jews from Lakewood will move into Howell Township.  Such fear is motivated by hostility toward this religious denomination.

260.   A December 22, 2015 article in *The Atlantic* about a low-income housing project proposed in Howell, published one day after the Plaintiffs' first hearing before the Board, stated in part:

> But, in this case, that undesirable element wasn't the usual target of affordable-housing opponents: "We do not need this ... This means we are going to have more Jewish families milking the system," one woman wrote on the Facebook page of Howell Happenings NJ.
>
> "I moved to Howell 15 years ago to get away from garbage. Now the garbage is getting dumped on top of me," another man wrote. This comment received four likes on the Howell Happenings NJ Facebook page.
>
> There were dozens of others, from Howell residents fearing that a community of Hasidic Jews living in nearby Lakewood, New Jersey, would "take over" Howell, that the new affordable housing units would drag down property values and deplete the town's coffers.
>
>     . . . .
>
> . . . .   The complaint that affordable housing will bring Jews to a neighborhood is far less common, but in the same vein as these other, more typical, arguments. A vocal group of Howell residents wanted their town to stay just as it was, and they targeted the group that they believed threatened that.
>
>     . . . .
>
> . . . .  But Howell town residents jumped to the conclusion that the housing would be for Hasidic Jews. The neighboring town of Lakewood has a large orthodox Jewish community because of a yeshiva (a Jewish school) there, and many of the commenters worried that Howell would become "Lakewood north."

"You all know this is going to be for Hasidic Jews only. They have been trying to expand into Howell for years," one commenter wrote.

"The Hasidic's [sic] have this town Coucil [sic] And Monmouth County in the Hands [sic] I'm assuming they're planning on making a large park for them After they dominate the area," another wrote.

On the site where the housing will be built, someone has put a small "Howell Strong" sign, which is a reference to a campaign in nearby Tom's River, called Tom's River Strong. In Tom's River, the signs are meant to discourage residents from selling to real-estate brokers who are allegedly soliciting places to sell to Lakewood residents. In Howell, Gotto sees the signs as a similar protest against the possibility of Hasidic residents moving in.

Such report accurately describes the hostility toward ultra-Orthodox Jews sentiment of many members of the Howell Township community.

261. Even the Mayor of Howell Township made the following statements regarding residents of Howell Township:

What I don't get, as a community, the level of discourse that has arisen in a very short period of time with some of the absolutely disgusting, anti-Semitic, racial, class separating comments that I've seen by so many residents of this town, predominantly on social media.

262. The Mayor further admitted: "It's not just a small group of people that are doing it anymore . . . ."

263. Residents have placed signs that state "Howell Strong" on their lawns. The purpose of such signs is to discourage ultra-Orthodox Jews from moving into Howell Township.

264. In the fall of 2015, at approximately the same time as Plaintiffs' application to the Township, an unrelated development was proposed within the Township of Howell that would include the construction of 72 low-income housing units.

265. Reported comments regarding the low-income housing project included:

- "It's the cult like behavior and hostile takeover of a zip code that is troubling to everyone."

- "They want to take over Howell now. Look at all the businesses they have opened here in the past year or so."

- "Low-income housing or a Hasidic community will absolutely drag property values down. This is not a racist or derogatory comment by any means, but a simple fact."

- "This community will benefit no one except the Hasedic [sic] community since the builder is hasedi [sic]!"

266. The opponents of the development immediately formed a "closed" Facebook group called "West Farms R9 Housing Project."

267. The discussions within the "closed" group immediately took on a strongly anti-Semitic character.

268. Such comments aimed at ultra-Orthodox Jews exist on the West Farms R9 Housing Project despite that group's administrators stating: "Please remember when you post, post as if you are speaking in a very public forum because while this is a CLOSED group, it is still a very, public forum. This Group was formed as a means of sharing ideas, raising awareness of future developing in our town and mostly, encouraging community involvement. If any of the Admins feel any posts are in any way inappropriate, for the protection of all of our members and protecting the basis of this group, those posts will be deleted immediately."

269. Thus, the Howell Township community's comments listed below are only those that had not been "deleted immediately."

270. Multiple participants in the "closed" group made allusions to Lakewood as a euphemism for ultra-Orthodox Jews.

271. Other comments within the group alluded to classic anti-Semitic tropes such as Jews' supposed carnality, dirt and disease, criminality and conspiracy. A typical posting on the Facebook group is:

> If there was a hoard of locusts heading for Howell that would deplete all our resources you would do everything you could to stop it wouldn't you? Of course you would. . . .  Being Anti Hasidim is not in any way antisemitism so don't worry about it. Is anyone here against Jews? Or are you against what only can be called a cult that comes in like locusts and destroys our town.

272.  Howell Township community members published statements regarding the Plaintiffs' application on the West Farms R9 Housing Project demonstrating hostility and animus toward ultra-Orthodox Jews, including "No doubt the same thing will happen here if the Yeshiva receives approval on Ford Road. Before you know it, they'll be getting enough votes to take over a seat on our council and BOE board."

273.  Real-time updates on the December 21, 2015 hearing on Plaintiffs' application were also included within the West Farms R9 Housing Project Group. Comments included:

- "That's my concern as well. Also, the students 18-22 are they allowed to marry and if so where are the wives and children housed? This is how it starts. Bring in the men/ students and before you know it there is an extreme need to build build build to accommodate more and more people."

- "I wanted to ask if the 7 houses built for faculty will have finished basements so they can squeeze 2 families per house."

- "Or maybe hold services which is what they do in Lakewood"

274.  Many members of the Howell community stated their opposition to the low-income housing project based on a perceived connection with ultra-Orthodox Jews.  Such statements include:

- "Low income housing. 72 units. Section 8 owned by Hasidic so tax exempt. Not good"

- "Ugh, I have so long to go till mine graduate HS but I don't think we could wait that long if they start moving in. They will make Howell a shit hole like they did to Lakewood. Excuse my language. We just dont know where we would move"

- "Will it be built like section 8 in lakewood [sic] with 2 kosher kitchens"

- "The zoning and planning boards have already ceded southern Howell to Lakewood."

- "The rabbi will charge the tenants minimal so 8% of nothing is nothing for Howell. They leach off society."

- "The fact that the Hasidic community comes out to vote in droves is invaluable to politicians. I am scared."

- "Thank you for this but I don't think people are as concerned with the housing. I believe people are concerned about the TYPE of people that will be brought into our town. THAT is in a nutshell the concern. No one wants this town to be Lakewood North!"

- "I am very opposed to a group of low income people who are not really low income moving in, not assimilating and pushing us all out by force. I don't want to be lied to by representatives only to find our wonderful town in this position."

- "100% affordable location would not necessarily be horrible per se, but in my humble opinion, we CANNOT discount the VERY real situation that we are located in an area being targeted by a community that would thrive in a development exactly like this one. We just can't ignore that. It's not bigotry, at least not on my part, it's just reality. This group of people does NOT want to live BESIDE anyone outside of their own community if at all possible."

- "I for one NEVER said anything bad or disrespectful about anyone! ....well maybe besides Lakewood. Not sorry about that!"

- "We want what is best for the town and they should want the same. It's no secret that we don't want an influx of the Hasidic community into Howell, as they are exclusionary and don't operate to the benefit of current residents."

- "The bottom line is Jewish people own it Jewish people are building it Jewish people are going to move in there and howell [sic] Township knows it"

- "They won't care. They will never move. They have been taught that they are the chosen ones since birth and adversity is part of their life. Meanwhile they bring it all onto themselves. They are parasites. Parasites don't care if you don't like them."

- ITS WASTE TO BE POSTING THE DUMB ASSHOLES WON MAKES ME SICK. I WANT TO MOVE OUT OF THIS TOWN YOU SEE IT WILL BE LAKEWOOD IN JACKSON AND HOWELL ITS ALL ABOUT MONEY THEY DESTROY EVERYTHING RUDE DIRTY ASS PEOPLE AND OUR TRAFFIC IS GONNE [sic] BE DRIVING IN F[***]ING LAKEWOOD I CAN'T STAND THEM IM [sic] SRY."

- "Even many of the people I know who are of the Jewish faith will tell you they do not want to have those of the Ultra Orthodox sect move in. Not because of the religion they share but because of the extremes in lifestyle they INSIST on imposing on their surroundings. Their beliefs that young married men should

be allowed to have families, be unemployed and dedicate themselves EXCLUSIVELY to religious studies, requiring the community to support them and their families is a fact. Their insistance [sic] on imposing their sensitivities to things like magazine covers on the larger community, is a fact. This group of people chooses to live according to a very rigid, inflexible, intolerant theology. That is their perogative [sic]. However, it is also my perogative [sic] to live my life my way and not have to share in the burden of paying for their young religious scholars to study exclusively and procreate at my tax dollar expense."

- "The Hasidic's only want Hasidic s. They segregate themselves from all other groups of people.I have friends that are devout Jewish, and they don't like the Hasidic's!"

- "The conservative orthodox community get a bad rap because of this group they can't even be called Jewish because they don't follow the Torah or true Jewish law. They, like the pharisees of Bible times, have bastardized the Torah to fit their arrogance."

275.   One newcomer to the "closed" group asked, "I would like to ask why you all are so against affordable housing? All I read here is everyone is against it but I haven't seen one comment on why."  An administrator of the group, who had previously cautioned against saying anything that could be "misconstrued" responded, "We are not against affordable housing. Please read through some of the very first original posts on these pages so you can catch up and see what we are actually working against here. All the information is available for you to educate yourself. Thank you for your interest and welcome."

276.   Another newcomer asked, "Can I just ask a question..I'm newly paying attention to this situation so sorry if I sound uneducated on this topic, but I am. Is this community for Jewish families from Lakewood to move into? Also, if the answer is yes. How does this directly impact the people in Howell? I know 100000 people are going to respond but I just so that no one is nasty in their replies back but I honestly just heard about this today."

277.   A group member responded, "They wouldn't pay taxes while ours rise. History and track record shows, factually, they get on board and take over schools and a towns funds. Read

some other posts or comments. Or rather, honestly drive through Lakewood, it was once a beautiful middle class town!"

278.   In response to a post by one member that the opposition was about taxes, a vocal opponent responded, "Not just about taxes, go take a ride through Lakewood."

279.   In response to postings on social media specifically related to the perceived connection between the affordable housing project and ultra-Orthodox Jews, the Mayor and Township Council of Howell Township wrote:

> Recently, the Township and residents have had to address controversial topics. Often, these subjects are discussed on social media. Although many know that social media is an outlet for sharing opinions, it doesn't always serve the community well when discussions are not based upon facts. This is unfortunate because the result of disseminating misinformation and half-truths can create a divide among friends and neighbors. As a society, we often believe what we read, without checking or asking for facts because we want instant gratification; work, school, children, holidays everything that takes place on a daily basis leaves us rushing around without much time to stop and listen.

280.   The Mayor, Township Council and Board are aware of the anti-Semitic sentiment that exist among many Howell Township residents.

281.   In an interview with a newspaper, the Mayor defended the affordable housing project not on the basis that the community should not harbor anti-Semitic animus, but rather on the basis that "there were no connections to Lakewood (or) Orthodox (Jews) – there were no dots to connect."

282.   The Mayor and Township Council further "encourage[d] everyone to attend local council, planning board and zoning board meetings, write or call your state and local elected officials and administration with questions you have before you make a decision to say something that is incorrect or reach a conclusion not based in fact."

283.  Members of the "West Farms R9 Housing Project" Group also formed the "Howell NJ Strong" Facebook page.

284.  On December 11, 2015, the Administrator of the Howell NJ Strong "Page" posted information about Plaintiff's application, including the misinformation that "[t]he students who would be housed there come with families."

285.  Other comments from Howell Township community members regarding the Plaintiffs' application on the "Howell NJ Strong" page include: "This town is done as we know it."

286.  Other comments on the "Howell NJ Strong" page include:

- "I don't want the orthodox here because they all lie about their households. They claim that their homes are "places of worship," so they don't have to pay property taxes! Then, because their schools, while exclusive to Jewish children, are still considered public, it's OUR tax dollars that pay for their education and their bussing, even though they don't pay a dime! They have a private police force that WE pay for. They have private ambulances that WE pay for. Not them. Never them. So we eventually move out of our homes, completely unable to pay the ridiculous amount of property taxes to make up for the fact that we don't pay, and those who didn't sell immediately when they started to invade, will have a really hard time selling. An orthodox will buy your home off you for next to nothing and you will get screwed. They are nothing more than community parasites. They only get married religiously and not legally, so the women can collect federal and state aid as a "single mother" of like, 9 kids. Must be nice to make that much money from the government, because they're walking around in their Michael Kors bags and Banana Republic skirts (which are NOT cheap)! There are brothels literal WHORE HOUSES in Lakewood because they are forbidden from many different things with their wives, but their prostitutes are fair game. The amount of venereal disease is alarming in Lakewood because of it. Someone in the maternity ward at Kimball (back when that was still a thing) said that the women are so uneducated about sex, birth, and their own bodies that they think that it's part of pregnancy and labor to have herpes! They all have herpes from their husbands screwing around with prostitutes! And because no one pays taxes, their roads are shit, the schools are shit… They will ruin everything. This is the reality and for this asshole to claim that this has anything to do with our town's autonomy, is insulting. Those of us who actually KNOW what these people do, don't care about little league. We care about our town!!!!"

- "The Hassidic population is antisemitic to the core. It is in fact a cult. A cult that does not want anyone that is not part of the cult in their neighborhoods or villages. A cult that happens to be Jewish. They do however want everyone outside of them to pay for their lives. Hassidics do not recognize any other form of the Jewish religion because it conflicts with theirs. They call us, my children, Golums. Translated it means devil. But, and this is a HUGE but, they will be the first to play the antisemitic card when they dont get what they want. They have no shame."

287.   The Facebook page "Howell Happenings" posted real-time updates on the December 21, 2015 hearing on Plaintiffs' application.  Comments on the page included:

> The mayor called me and so did one of the other board members way back in September when I wrote to them about zoning of private schools and religious institutions along the Rt 9 corridor and I was told, over and over again, that it can't be done! BUT now they move down the road some and we are looking at a school that will NOT allow any other student there who is not an Orthodox Jewish person! St. Veronica's school is open to EVERYONE, Catholic or not! My point being why do we need a school that none of our resident's [sic] can go to when maybe they would want to? It's all a bunch of lies from elected board members who don't have the guts to stand up for the rights and quality of life we have come to expect from Howell! Time to vote these people out and get people in who have Howell's best interest at heart!! WE WANT A COMMUNITY FOR ALL, NOT JUST FOR SOME LIKE LAKEWOOD HAS BECOME!!

288.   Similarly, another member of the Howell community stated: "it's hard to fight against people who look at you like you're lower than dirt when they're toting around 8 and 9 kids after 9:00 PM WHEN THEY SHOULD BE IN BED!!! I am NOT a prejudiced person, but they MAKE you not like them. It's like they do it on purpose. Wait till they move in and make Howell taxes (that's us) pay for busing to all the Yeshivas. It's gonna get even more expensive, yet property value will plummet…"

289.   Other community comments describe communications with Township officials, including: "ANDwhen i spoke to the mayor last year about this he said they dont allow their businesses in Howell.!?!"  Upon information and belief, the use of the term "they" referred to ultra-Orthodox Jews.

290.   The Board's determination that the Kollel's use was not an "educational facility" severely impedes and prevents Plaintiffs' exercise of its religion.

291.   The Board's denial of the Kollel's request for interpretation took place within a system of formal procedures that permitted the Board to make individualized assessments for the uses for the property involved.

292.   The Kollel's proposed use would affect interstate commerce by or through, amongst other things, the Kollel's fundraising activities related to the construction; the transfer of funds to those it engages to construct the *mesivta* and *yeshiva gedola*; the engagement of construction companies to construct the *mesivta* and *yeshiva gedola*; the employment of and payments to construction workers either by the Kollel or by companies engaged by it; the purchase of necessary materials to construct the *mesivta* and *yeshiva gedola*; the engagement of a landscaping company; the use of interstate highways for the transportation of persons and materials used to construct the *mesivta* and *yeshiva gedola*; the use of interstate communication related to the construction of the *yeshiva gedola*; and other activities related to the construction of the *yeshiva gedola*.

293.   The operation subsequent to the *mesivta* and *yeshiva gedola's* construction would affect interstate commerce.  The Kollel's operation would affect interstate commerce by or through, amongst other things, serving as a site for ongoing fundraising; its receipt of charitable donations from persons working or living outside of the State of New Jersey; the use of means of interstate communication to facilitate the *mesivta* and *yeshiva gedola's* ongoing operations; the use of interstate travel related to the *mesivta* and *yeshiva gedola's* ongoing operations; the employment of any part-time or full-time employees; and the purchase of goods and services related to the *mesivta* and *yeshiva gedola's* ongoing operations and maintenance.

294.  The Defendants' actions described above all took place under color of state law.

295.  The Board was informed of the applicability of RLUIPA to its actions.

296.  The harm to the Kollel caused by the Defendants' laws and actions, which prevent it from using the Property to accommodate its religious needs, is immediate and severe.

297.  The Kollel has no other location from which it can offer a *mesivta* and *yeshiva gedola*.

298.  Defendants' laws and actions imminently threaten to substantially burden the Plaintiffs' free exercise of religion.

299.  There are no quick, reliable and viable alternative options for the Kollel's proposed use.

300.  The Kollel has no adequate remedy at law for the harm and damage caused by Defendants' wrongful laws and actions.

301.  The Plaintiffs have also suffered significant financial damages as a result of the Defendants' laws and their application to the Kollel.


## COUNT I

### Violation of Religious Land Use and Institutionalized
### Persons Act of 2000 – "Substantial Burdens"
### 42 U.S.C. § 2000cc(a)

302.  Paragraphs 1 through 301 are incorporated by reference as if set forth fully herein.

303.  Defendants have deprived and continue to deprive the Plaintiffs of their right to the free exercise of religion, as secured by RLUIPA, by imposing and implementing land use regulations both on their face and as applied in a manner that places substantial burden on the Plaintiffs' religious exercise without using the least restrictive means of achieving a compelling governmental interest.

49

## COUNT II

**Violation of Religious Land Use and Institutionalized
Persons Act of 2000 – "Nondiscrimination"
42 U.S.C. § 2000cc(b)(2)**

304.   Paragraphs 1 through 303 are incorporated by reference as if set forth fully herein.

305.   Defendants have deprived and continue to deprive the Plaintiffs of their right to the free exercise of religion, as secured by RLUIPA, by imposing and implementing land use regulations both on their face and as applied in a manner that discriminates against them on the basis of religion and religious denomination.

## COUNT III

**Violation of Religious Land Use and Institutionalized
Persons Act of 2000 — "Equal terms"
42 U.S.C. § 2000cc(b)(1)**

306.   Paragraphs 1 through 305 are incorporated by reference as if fully set forth herein.

307.   Defendants have deprived and continue to deprive the Plaintiffs of their right to the free exercise of religion, as secured by RLUIPA, by imposing and implementing land use regulations both on their face and as applied in a manner that religious land uses them on terms that are less than equal to nonreligious assembly and institutional land uses.

## COUNT IV

**Violation of Religious Land Use and Institutionalized
Persons Act of 2000 — "Exclusion and Limits": Total Exclusion
42 U.S.C. § 2000cc(b)(3)(A)**

308.   Paragraphs 1 through 307 are incorporated by reference as if set forth fully herein.

309.   Defendants have deprived and continue to deprive the Plaintiffs of their right to the free exercise of religion, as secured by RLUIPA, by imposing and implementing land use regulations both on their face and as applied in a manner that totally excludes their religious assembly from within the jurisdiction.

## COUNT V

### Violation of the Fair Housing Act
### 42 U.S.C. § 3604

310.   Paragraphs 1 through 309 are incorporated by reference as if set forth fully herein.

311.   The Defendants have intentionally discriminated against the Plaintiffs by making housing unavailable within Howell Township because of religion in violation of 42 U.S.C. § 3604(a).

312.   Defendants' land use regulations have had the effect and continue to have the effect, whether intended or not, of excluding Plaintiffs from obtaining housing within Howell Township by discriminating against the Plaintiffs based on religion, in violation of 42 U.S.C. § 3604(a).

313.   Plaintiffs are aggrieved persons as that term is defined in the Fair Housing Act, 42 U.S.C. § 3602(i) and they have suffered harm, damage and injury as a result of Defendants' conduct.

## COUNT VI

### United States Constitution
### Violation of 42 U.S.C. § 1983: First Amendment
### Free Exercise of Religion

314.   Paragraphs 1 through 313 are incorporated by reference as if set forth fully herein.

315.   Defendants have deprived and continue to deprive the Plaintiffs of their right to free exercise of religion, as secured by the First Amendment to the United States Constitution and made

applicable to the States by the Fourteenth Amendment, by substantially burdening their religious exercise without using the least restrictive means of achieving a compelling governmental interest, and by discriminating against them on the basis of religion.

## COUNT VII

**United States Constitution**
**Violation of 42 U.S.C. § 1983: Fourteenth Amendment**
**Equal Protection**

316.  Paragraphs 1 through 315 are incorporated by reference as if set forth fully herein.

317.  Defendants have deprived and continue to deprive the Plaintiffs of their right to equal protection of the laws, as secured by the Fourteenth Amendment to the United States Constitution, by discriminating against them in the imposition and implementation of their land use regulations.

## COUNT VIII

**United States Constitution**
**Violation of 42 U.S.C. § 1983: First Amendment**
**Free Speech**

318.  Paragraphs 1 through 317 are incorporated by reference as if set forth fully herein.

319.  The zoning ordinances of the Township of Howell set forth the principal uses permitted in the ARE-2 zoning district in which the Plaintiff's property is situated.

320.  The zoning ordinances of the Township of Howell, as amended by Ordinance O-07-09 (adopted on March 20, 2007), included "educational facilities" as a permitted principal use

in the ARE-2 zoning district at the time of Zebra Holdings II, LLC's purchase of the Subject Property and at the time of its zoning application.

321.   There is no definition of the term "educational facilities" set forth in the zoning ordinances of the Township of Howell.  The term "educational facility" does not provide people of common intelligence in light of ordinary experience a reasonable opportunity to understand what constitutes a permitted "educational facility" within the ARE-2 zoning district.

322.   In the absence of objective criteria and definition of the term "educational facility," the Defendants were unconstitutionally afforded unbridled discretion during their review of the Plaintiffs' application to build and operate a *mesivta* and *yeshiva gedola* on the Subject Property.

323.   The zoning ordinances of the Township of Howell, as applied to the Plaintiffs' application, constitutes an impermissible prior restraint on Plaintiffs' protected religious expression under the First Amendment.

324.   By denying Plaintiffs' application on the basis of its religious nature, the Defendants have deprived and continue to deprive the Plaintiffs of their right to freedom of expression, as secured by the Fourteenth Amendment to the United States Constitution, by discriminating against them on the basis of the viewpoint and content of the Kollel's speech.

## COUNT IX

**Action in lieu of prerogative writ**
**New Jersey Municipal Land Use Law**
**N.J.S.A. § 40:55D-1 *et seq.***

325.   Paragraphs 1 through 324 are incorporated by reference as if set forth fully herein.

326.   The actions of the Board were arbitrary, capricious, unreasonable and contrary to law.

327.   The action of the Board to uphold the erroneous August 31, 2015 written decision of  the Director was arbitrary and capricious and an abuse of its discretion.

328.   The action of the Board to define the Kollel's use as a school, even when the Director did not adopt such a definition in his August 31, 2015 written decision, was arbitrary and capricious and an abuse of its discretion.

329.   The action of the Board to define the Kollel's use as a house of worship, even when the Director did not adopt such a definition in his August 31, 2015 written decision, was arbitrary and capricious and an abuse of its discretion.

330.   The action of the Board to define the Kollel's use as a school, directly contrary to the ZO, the opinions of Township officials, and the undisputed evidence, was arbitrary and capricious and an abuse of its discretion.

331.   The action of the Board to define the Kollel's use as multi-family housing, directly contrary to the ZO, was arbitrary and capricious and an abuse of its discretion.

332.   The failure of the Board to set forth a definition of educational facility even though this is the use proposed by the Kollel was arbitrary and capricious.

333.   The failure of the Board to adopt the definition of educational facility adopted by the New Jersey Educational Facilities Authority and N.J.S.A 18A:72A-1 *et seq.* or to consider the definition of educational facilities adopted by other municipalities, even though Howell failed to define the term in its ordinance, was arbitrary and capricious.

334.   The failure of the Board to determine that the Kollel's proposed use is an educational facility is arbitrary and capricious.

335.   The Board abused its discretionary authority in its interpretation that the Kollel's proposed use did not constitute an educational facility.

336.   The decisions of Board were based on conclusions contrary to the weight of the evidence adduced at public hearings and the Board failed to place its reasons for the denial on the record.

337.   The Plaintiffs' interests have been adversely affected and manifest injustice created by the Board's arbitrary, capricious and unreasonable application of their planning, zoning and land use powers.

## COUNT X

### Violation of the New Jersey Law Against Discrimination, N.J. Stat. Ann. § 10:5-12.5

338.   Paragraphs 1 through 337 are incorporated by reference as if set forth fully herein.

339.   By denying Plaintiffs, on the basis of religion, the opportunity to obtain the accommodations, advantages, facilities, and privileges of ownership of real property, Defendants violated and continue to violate their rights under the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1, *et seq.*

340.   Defendants' conduct has caused significant damage to Plaintiffs.

341.   Defendants are liable for the damage caused to Plaintiffs, and should be enjoined from further violating Plaintiffs' rights.

## COUNT XI

### New Jersey Constitution
### Violation of Art. 1 ¶¶ 1, 3

342.   Paragraphs 1 through 341 are incorporated by reference as if set forth fully herein.

343.    Defendants have deprived and continue to deprive the Plaintiffs of their rights, as secured by paragraphs 1 and 3 of the New Jersey Constitution, to "worship[] Almighty G[-]d in a manner agreeable to the dictates of [their] own conscience," and to be free from laws that are unconstitutionally vague as applied to Plaintiffs.

## PRAYER FOR RELIEF

WHEREFORE, CONGREGATION KOLLEL, INC. and ZEBRA HOLDING II, LLC respectfully requests that this Court grant the following relief:

1.    A declaration that the Township of Howell's land use ordinances, to the extent that they substantially burden, exclude, unreasonably regulate, and discriminate against the Plaintiffs' land use, are void, invalid and unconstitutional on their face and as applied to the Plaintiffs on the ground that they violate the Free Exercise and Free Speech Clauses of the First Amendment to the United States Constitution, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, the Religious Land Use and Institutionalized Persons Act, the Fair Housing Act, the New Jersey Law Against Discrimination, and the New Jersey Constitution, Article 1 ¶¶ 1, 3;

2.    A declaration that the denial of the Plaintiffs' request for interpretation to permit it to use the Subject Property for religious education is void, invalid and unconstitutional on the ground that it violates the Free Exercise and Free Speech Clauses of the First Amendment to the United States Constitution, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, the Religious Land Use and Institutionalized Persons Act, the Fair Housing Act, the New Jersey Law Against Discrimination, and the New Jersey Constitution, Article 1 ¶¶ 1, 3;

3.    An order reversing the decision of the Howell Township Zoning Board of Adjustment and an order declaring that the Plaintiffs' request for interpretation to used the Property for purposes of religious education is hereby approved;

4.    An order directing the Howell Township Zoning Board of Adjustment to reverse its denial of the Plaintiffs' request for interpretation and approve the request to permit the Plaintiffs' use of the Property for purposes of religious education as applied for;

5.    Preliminary and permanent orders enjoining the Defendants, their officers, employees, agents, successors  and all others acting in concert with them from applying their laws in a manner that violates the Free Exercise and Free Speech

Clauses of the First Amendment to the United States Constitution, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, the Religious Land Use and Institutionalized Persons Act, the Fair Housing Act, the New Jersey Law Against Discrimination, and the New Jersey Constitution, Article 1 ¶¶ 1, 3, or undertaking any and all action in furtherance of these acts;

6. An award of compensatory damages against Defendants in favor of the Plaintiffs as the Court deems just for the loss of its rights under the First and Fourteenth Amendments to the United States Constitution, and the Religious Land Use and Institutionalized Persons Act, the Fair Housing Act, and the New Jersey Law Against Discrimination incurred by the Kollel and caused by the Defendants' laws and actions;

7. An award to the Plaintiffs of full costs and attorneys' fees arising out of Defendants' actions and land use decisions and out of this litigation; and

8. Such other and further relief as this Court may deem just and appropriate.

## DEMAND FOR JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury in this action on all issues so triable.

Respectfully submitted by the Plaintiffs this 27th day of July, 2016.

KENNY CHASE & COSTA
By: /s/ Christopher K. Costa
Christopher K. Costa
3812 Quakerbridge Road
Hamilton, N.J. 08619
Phone: (609) 588-9800 x.26
Fax: (609) 588-0588

STORZER & GREENE, P.L.L.C.
Sieglinde K. Rath
1025 Connecticut Ave., N.W. Suite 1000
Washington, D.C. 20036
Tel: 202.857.9766
Fax: 202.315.3996

*Attorneys for Plaintiffs*

<u>CERTIFICATION</u>

Pursuant to <u>R</u>. 4:69-4 of the New Jersey Court Rules, I hereby certify that all transcripts have been ordered and will be filed with the Court after the matter has been assigned a judge for total handling.

KENNY CHASE & COSTA
By: <u>/s/ Christopher K. Costa</u>
Christopher K. Costa
3812 Quakerbridge Road
Hamilton, N.J. 08619
Phone: (609) 588-9800 x.26
Fax: (609) 588-0588

*Attorney for Plaintiffs*

<u>CERTIFICATION</u>

Pursuant to Local Civil Rule 11.2, I hereby certify that this matter is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding and that no such action, arbitration or administrative proceeding is contemplated at this time.  I do not know of any other party who should be joined in this action.

KENNY CHASE & COSTA

By: <u>/s/ Christopher K. Costa</u>
Christopher K. Costa
3812 Quakerbridge Road
Hamilton, N.J. 08619
Phone: (609) 588-9800 x.26
Fax: (609) 588-0588

*Attorney for Plaintiffs*